**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:13CV701-RLV**

| | | |
|---|---|---|
| **VANCE E. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM and ORDER** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

THIS MATTER is before the Court on cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Docs. 13, 14, 17, 18). Also before the Court are supplemental filings concerning the applicability of *Mascio v. Colvin*.[2] (Docs. 22, 23).

## I.    FACTUAL BACKGROUND

On June 22, 2010, Plaintiff Vance Edward Williams ("Mr. Williams" or "Claimant") applied for disability insurance benefits alleging that he was disabled due to bipolar depressive disorder and severe lower back pain. (Tr. 50). In June 2010, Mr. Williams (DOB: 2/29/1964) was forty-six years old with an eighth grade education. Mr. Williams' most recent work experience was in 2008 and included construction work such as floor coverings, back splashes, and drywall. (Tr. 34). In his application, Claimant contends he has not been able to work on a sustained basis since June 11, 2010.

There is a gap between Claimant's most recent work and his alleged June 2010 disability onset date. In October 2008, Mr. Williams was incarcerated in the North Carolina Department of

---

[1] Carolyn W. Colvin is the acting Commissioner of the U. S. Social Security Administration.

[2] 780 F.3d 632 (4th Cir. 2015).

Corrections ("DOC") for a probation violation.  (Tr. 36).  The underlying criminal offense / violation was speeding to elude arrest (failing to stop at a checkpoint).  (Tr. 36, 191).  Mr. Williams first sought mental health treatment within the DOC.  (Tr. 185).

Mr. Williams' claim was initially denied on August 30, 2010, and upon reconsideration on January 28, 2011.  Mr. Williams requested a hearing before an Administrative Law Judge ("ALJ").  On June 14, 2012, an evidentiary hearing was held before Administrative Law Judge Saul W. Nathanson.  Mr. Williams was represented by an appointed non-attorney representative at the hearing.  In a decision issued July 13, 2012, the ALJ denied Mr. Williams' claim for disability insurance benefits.  Mr. Williams sought review of the ALJ's decision.  The Appeals Council denied his request for review on October 22, 2013.  Accordingly, the ALJ's decision became the Commissioner's final decision.

## II.      STANDARD OF REVIEW

Judicial review of a final decision of the Commissioner in Social Security cases is authorized pursuant to 42 U.S.C. §405(g), and is limited to consideration of (1) whether substantial evidence supports the Commissioner's decision and (2) whether the Commissioner applied the correct legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  District courts do not review a final decision of the secretary *de novo*.  *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  A reviewing court must uphold the decision of the Commissioner, even in instances where the reviewing court would have come to a different conclusion, so long

as the Commissioner's decision is supported by substantial evidence. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982). In reviewing for substantial evidence, a court may not re-weigh conflicting evidence, make credibility determinations, or substitute its own judgment for that of the Commissioner. *Craig*, 76 F.3d 585 at 589. The administrative law judge, and not the court, has the ultimate responsibility for weighing the evidence and resolving any conflicts. *Hays*, 907 F.2d at 1456.

### III.    THE ALJ'S EVALUATION PROCESS

The ALJ must follow a five-step sequential evaluation process to determine if the claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. First, it must be determined if the claimant is involved in any substantial gainful activity. If he is, then the claimant is not disabled regardless of his physical or mental condition, age, education, or work experience. 20 C.F.R. §§ 404.1520, 416.920. Second, it must be determined whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. If not, then the claimant is not disabled. *Id*. Third, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled regardless of age, education, or work experience. *Id*. Before moving to the fourth step, the ALJ must first determine the claimant's residual functional capacity ("RFC"). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *Id*. At step four, if the claimant can perform the requirements of his past relevant work, then he is not disabled. *Id*. At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *Id*. The Social Security Administration is responsible for

providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. 404.1512(g), 404.1560(c), 416.912(g), and 416.960(c).

In this case, the ALJ determined at step one that Mr. Williams had not engaged in substantial gainful activity since June 22, 2010, the date of his application. (Tr. 24). At step two, the ALJ found that Mr. Williams suffered from severe impairments including lumbar degenerative disc disease and major depressive disorder.[3] (Tr. 24). At step three, the ALJ found that Mr. Williams' severe impairments, individually or combined, did not meet or medically equal the severity of any listed impairments warranting a finding of disabled. See 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). (Tr. 24). Next, the ALJ expressly stated that he undertook a "function-by-function assessment" of claimant's RFC.[4] (Tr. 27). The ALJ found that "claimant's lumbar disc disease causes limitations on lifting and carrying" and that "mentally, the claimant is limited to performing the simple, routine tasks involved in "unskilled" work." (Tr. 27). The ALJ concluded that Mr. Williams had the residual functional capacity ("RFC") for the full range of sedentary work.[5] (Tr. 24). At step four, given

---

[3] Degenerative disc disease refers to "the age-related changes that occur in the spinal disks, such as drying of the nucleus pulposus and tears or cracks in the annulus fibrosis." *Social Security Disability Practice* § 7:2 (2015). Major depressive disorder is a type of affective disorder. Affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Social Security Disability Law and Procedure in Federal Court*, § 5:25 (2015) (internal citation omitted).

[4] To the extent the Commissioner asserts that the ALJ's express statement that he undertook a function-by-function assessment of Mr. Williams' RFC makes it so, the undersigned disagrees. As explained herein, the ALJ does not engage in a function-by-function analysis of Mr. Williams' mental (nonexertional) RFC.

[5] "Sedentary work" is defined as: "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

4

his RFC, the ALJ found that Mr. Williams is unable to perform his past relevant work in the construction industry as a rebar worker – a job requiring very heavy exertion.  (Tr. 27).  At step five, the ALJ noted Mr. Williams' age and education but found that transferability of job skills was immaterial in light of the Medical-Vocational Rules (the "Grid").  (Tr. 27).  Applying the Grid, namely, Medical-Vocational Rule 201.19, the ALJ found that Mr. Williams could make a successful adjustment to other work and that considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  *See* Section 204.00 in the Medical-Vocational Guidelines and SSR 85-15.  Ultimately, the ALJ found that the Medical-Vocational Rules dictated a finding of "not disabled."  (Tr. 27).

## IV.    DISCUSSION

The issues on appeal are (1) whether the ALJ performed a function-by-function assessment of claimant's RFC; (2) whether the ALJ failed to account for the claimant's moderate difficulties in concentration, persistence, and pace in his RFC; (3) whether the ALJ properly relied upon the Medical-Vocational Guidelines in finding claimant not disabled; and (4) whether the ALJ's step three rationale adequately set forth why claimant's severe impairment did not meet or satisfy Listing § 1.04A.  For the reasons discussed below, the Court concludes that the ALJ's RFC analysis and decision was not function-by-function as represented and did not account for the claimant's moderate difficulties in concentration, persistence, and pace.  Because remand is required on this basis, the Court need not resolve the additional issues raised by Plaintiff at this time but will nonetheless provide guidance as appropriate.[6]

---

[6] Indeed, resolution of the other issues (reliance on the Grids) depends in part upon the existence, nature, and severity of the alleged non-exertional impairments and attendant functional limitations.  For this reason, the Court's discussion of the record evidence will be limited to the Claimant's mental

## A. Record Evidence Probative of Claimant's Residual Functional Capacity

Because Mr. Williams did not pursue mental health treatment for his symptoms of depression and anxiety until he was in the DOC, the evidence of record speaking directly to his mental (nonexertional) impairment only covers approximately two years. In addition, the record includes multiple references using different terminology to describe Mr. Williams' mental impairment.[7] Considered along with the fact that the treatment records cover a relatively short period of time, the lack of specificity makes it especially difficult for the Court to evaluate the diagnosis and conduct the review for substantial evidence.

In January 2010, Mr. Williams underwent a mental health screening through the DOC and was referred for further evaluation and/or treatment for reported depression. (Tr. 198−200). Claimant presented as depressed but stable. (Tr. 199−200). Mr. Williams was cooperative in his attitude, displayed a depressed mood and affect, congruence of affect was normal, range of affect was narrow, stability of affect was stable, exhibited normal speech, was oriented, his attention, memory, and concentration were noted as unimpaired, and his thought processes were unimpaired, coherent, and normal. (Tr. 200). No risk of self-injury, violence, or escape was noted. (Tr. 200).

In February 2010, Mr. Williams was seen by Dr. B.J. Hamra at Craven Correctional Institute for depression and anxiety. (Tr. 189−90). Mr. Williams reported that "for a long long

---

impairments and / or the effect of Claimant's mental impairments in combination with his severe physical impairment (spinal stenosis) upon his RFC.

[7] For example, Carolinas HealthCare Systems records use the term "depressive disorder" as opposed to "major depressive disorder." (Exh. 5F). The term "bipolar disorder" is used in summaries of claimant's mental impairment by Emily Sinks, Specialist with the North Carolina Disability Determination Services and likewise by Intake Specialist / Social Worker Vincent Burris with the Mecklenburg County Department of Social Services. (Exhs. 3F, 4F). The broader "affective disorder" term is used by Dr. Albertson, one of the state agency consultants relied upon by the ALJ. (Exh. 1A).

time he had periods when he feels depressed and he has no energy and decreased interest and sometimes has crying spells and moodiness." (Tr. 189). Mr. Williams represented that he "never asked for help on the streets" even though these periods of depression could "last for quite some time," but "did not appear to have any major [e]ffect on his life except his relationship with people around him who are very close to him." (Tr. 189). Mr. Williams was reportedly prescribed Amitriptyline in the jail for a short period of time, presumably for depression.[8] (Tr. 189). Mr. Williams did not report having any suicidal or homicidal ideas and was not deemed to be an active risk for violence, self-injury or escape. (Tr. 189−90). Dr. Hamra observed that Mr. Williams was generally calm and cooperative during the interview, responded to questions adequately, did not appear to be very anxious, but had slight dysphoric feelings and was convinced that he needed help. (Tr. 189−90). No psychotic symptoms like delusions or hallucinations were reported. (Tr. 190). Dr. Hamra characterized Mr. Williams' insight and judgment as "fair." (Tr. 190). No medication was prescribed by Dr. Hamra at that time. (Tr. 190). Upon learning that taking antidepressants would affect his placement within the DOC, Mr. Williams opted not to take any psychotropic medication and chose to defer treatment until he was released from DOC. (Tr. 190).

DOC records from March 2010 reflect that Mr. Williams reported experiencing sleeplessness, feelings of worthlessness, crying spells, decreased appetite, irritability, feelings of isolation, and ongoing depression preceding his incarceration. (Exh. 1F / Tr. 186, 197). Mr. Williams also reported a history of substance abuse (cocaine, marijuana, alcohol) to "mask" his

---

[8] There is also a reference within the DOC records of a possible Elavil prescription issued by the county jail. (Tr. 192, 199).

feelings of depression and anxiety.[9]  (Tr. 197, 201−03).  Mr. Williams' overall mental status was described as "stable" and his affect "dysphoric."  (Tr. 197).  DOC staff referred Mr. Williams for psychiatric evaluation.

In April 2010, Dr. John S. Carbone diagnosed Mr. Williams with "Depressive Disorder NOS" (or "Not Otherwise Specified) (Axis I: 311.00) and a secondary diagnosis of "Chronic subjective back pain" (Axis III).[10]  (Tr. 188).  Dr. Carbone prescribed medication (Wellbutrin XL 150 mg) to treat Claimant's symptoms of depression.  (Tr. 188).

In May 2010, Mr. Williams reported having "irritable feelings – very irritated by everyone and [every]thing."  (Tr. 195).  Mr. Williams reported being awakened from sleep "sweating, heart racing, nervous panic feeling."  (Tr. 195).  In addition, Mr. Williams claimed that his concentration was "very poor," that he was experiencing dizzy spells, and very often depressed and withdrawn.  (Tr. 195).  Claimant asked for help as soon as possible.  (Tr. 195).

---

[9]  DOC records show that Mr. Williams self-reported that his last drug use was between eight and fifteen years ago.  In January 2010, he reported his most recent marijuana use as eight years prior.  (Tr. 209).  DOC records from February 2010 indicate that Mr. Williams last used drugs (cocaine) eight years ago, which would mean sometime in 2002. (Tr. 202).  DOC records dated March 2010 indicate that Mr. Williams' last drug usage (marijuana and alcohol) was approximately ten to fifteen years ago.  (Tr. 203).  There are other treatment notes reporting that Claimant was occasionally using marijuana to ease his back pain prior to his probation violation and that the presence of paraphernalia in his vehicle prompted his failure to stop for law enforcement. Subsequent mental health treatment records indicate that Mr. Williams has been able to sustain long-term full remission of his previous substance abuse.

[10]  According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), there are four types of depressive disorders, including:
• Major depressive disorder, single episode
• Major depressive disorder, recurrent
• Dysthymic disorder
• Depressive disorder not otherwise specified (NOS).

Jerry Von Talge, Ph.D., *Major Depressive Disorder*, Am. Jur. Proof of Facts 3d (2015) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 382 (4th edition Text Revision 2000)).

In June 2010, Dr. Carbone described Mr. Williams' depression diagnosis as "Major Depression mild to moderate without apparent Psychotic Features currently in partial remission. Rule out Chronic Dysthymia" (Axis I: 296.31). (Tr. 187).

Mr. Williams participated in the aftercare planning process through the DOC. (Tr. 191). As a part of his aftercare plan, continued outpatient mental health treatment was recommended to address anxiety and depressive symptoms. (Tr. 191). Mr. Williams was released from prison in June 2010. (Tr. 36, 191).

On July 13, 2010, Mr. Williams was seen in the Emergency Department of Carolinas HealthCare System / Carolinas Medical Center for a refill of his prescribed medication, Wellbutrin XL 300 mg. (Exh. 5F) (Tr. 252−264). Medical personnel noted that Mr. Williams was "pleasant, motivated"; admitted to "on-going anger, anxiety, depression." (Tr. 264). Claimant agreed that his mood swings and anxiety were improved with Wellbutrin. (Tr. 264). Mr. Williams' Global Assessment Functioning ("GAF") score was 60.[11] (Tr. 260). The Diagnostic Impression by Dr. Edwin W. Sparks recognized Depressive Disorder (Axis I) as well as problems in occupational, economic, and social environments (Axis IV). (Tr. 260). Claimant

---

[11] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social and occupational functioning." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 1994) (DSM-IV). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, familiar relations, judgment, thinking, or mood. Id. A score between 41 and 50 indicates serious symptoms, such as suicidal ideation, serious impairment in social, occupational or school functioning. Id. A score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks or moderate difficulty in social, occupational or school functioning. Id.
The ALJ cited Mr. Williams' GAF as 60 and indicated it reflected "moderate, bordering on mild symptoms." (Tr. 26). The record as a whole shows that Mr. Williams' GAF was not constant and ranged from 40 to 60 during the relevant time period. Dr. Hartnagel assigned claimant a GAF of 40 in July 2010, which indicates more serious impairment. (Tr. 266). Similarly, in June 2012, Person Centered Partnerships rated Mr. Williams' GAF a 40. (Tr. 488).

was referred for outpatient treatment with Carolinas HealthCare System's Behavioral Health Center.

On July 29, 2010, Mr. Williams was seen by Dr. William R. Hartnagel, at Carolinas HealthCare System's Behavioral Health Center ("Carolinas HealthCare BHC") for psychiatric examination. (Exh. 13F) (Tr. 265). Upon examination, Mr. Williams was alert and conversant, made direct eye contact and answered all questions; cognitive skills such as speech, language, memory, and fund of knowledge and orientation and attention are all good. (Tr. 266). According to Dr. Hartnagel, Mr. Williams presented with "affect and mood [] marked by considerable anxiety." (Tr. 266). Claimant's anxiety was centered around where he would live and how he would receive necessary medical care. (Tr. 266). Mr. Williams complained that his medications were not working. (Tr. 266). Claimant reported episodic depression and hopelessness (accompanied by brief suicidal ideation never lasting more than one day). (Tr. 266). Thought content was positive for depressive cognitions such as low self-esteem and episodic hopelessness but claimant denied suicidal ideation, hallucinations, or violent thoughts. Insight and judgment were "fair." (Tr. 266). Diagnoses were as follows: Anxiety disorder, NOS; Depressive disorder, NOS, and History of cocaine, alcohol and marijuana abuse (Axis I), Chronic back pain (Axis III), Substantial social stresses (Axis IV), and Current GAF 40 (Axis V), which indicates impairment in reality testing or communication or major impairment in several areas, such as work or school, familiar relations, judgment, thinking, or mood. (Tr. 266). Given Mr. Williams' history of substance abuse and complaints of chest pain following an increase in his Wellbutrin dosage, Dr. Hartnagel discontinued Wellbutrin and elected to try a low dose of Benzodiazepine. (Tr. 267). Dr. Hartnagel scheduled Claimant for a follow up visit in one month, referred Mr. Williams for therapy, and to a free Medical Clinic to assist with

treatment for back and chest pain. (Tr. 267). Dr. Hartnagel monitored Mr. Williams' medication and saw Claimant regularly.

In November 2010, Dr. Hartnagel switched Claimant to Remeron and noted that Mr. Williams was having "ongoing problems with decreased appetite, problems with sleep and the chronic pain." (Tr. 345). Dr. Hartnagel observed that:

> [Mr. Williams] remains very anxious and continues to have ongoing episodes of panic. Patient states that he cannot be in social situations because it is almost overwhelming for him. On a positive note, patient is seeing Russell Hancock and patient is riding the bus independently. The patient has a niece that assists him with his care. The patient was unable to sit in the office without the door being opened.

(Tr. 345). During this visit, it was noted that claimant had begun the process of applying for Social Security Disability. (Tr. 345). As for his chronic back pain, Mr. Williams had discontinued use of his pain medication and was to receive epidural injections. (Tr. 345).

On April 7, 2011, the outpatient progress note states that Mr. Williams "continues to suffer with almost debilitating anxiety and panic." (Tr. 343). Mr. Williams' traumatic past young adulthood was noted, including having a twin sister who was shot and history in prison where he reports he was sexually assaulted on several occasions."[12] (Tr. 343). Mr. Williams was no longer taking Remeron because he could not afford the co-payment. (Tr. 343). Dr. Hartnagel prescribed Cymbalta and encouraged Mr. Williams to continue in outpatient therapy despite transportation issues. (Tr. 343). Mr. Williams' affective state was described as "anxious and tense" and his mood "anxious and dysphoric." (Tr. 343). Mr. Williams' "[t]hought content focused on ongoing persistent anxiety." (Tr. 343). Mr. Williams' GAF was a 60. (Tr. 343).

---

[12] The records from Persons Centered Partnership reflect that Mr. Williams only had two step-siblings and that his older step-sister was murdered in 2002 during a home invasion. (Tr. 483).

On April 19, 2011, Mr. Williams contacted Persons Centered Partnership ("PCP") to request additional assistance.  (Exh. 18F) (Tr. 480−89).  PCP is a component of the North Carolina Division of Mental Health, Developmental Disabilities and Substance Abuse Services. PCP undertook a comprehensive clinical assessment of Claimant, which corroborated much of what was already documented by Carolinas HealthCare.  PCP diagnosed the following:

Axis I:    296.33 Major Depressive Disorder Severe without Psychotic Symptoms
           300.00 Anxiety Disorder NOS
           309.81 Post-Traumatic Disorder, Chronic (GSW and sexual trauma)
           304.80 Polysubstance Dependence, Sustained Full Remission
Axis II:   799.9 Deferred
Axis III:  Herniated disc; Chest Pain from GSW (gunshot wound); Chronic pain
Axis IV:   Problems with primary support; housing; financial
Axis V:    GAF; current – 40

(Tr. 485, 488).  Claimant's insight and judgment were both deemed "poor."  (Tr. 484).  Attention and concentration were "decreased."  (Tr. 484).  Thought process was "coherent" and "goal directed."  (Tr. 484).  No problems with orientation were noted.  (Tr. 484).  Both short-term and long-term memory were deemed "impaired."  (Tr. 484).  Strengths were "intelligent," "motivated," and "verbal."  Weaknesses were "lacks support," "poor judgment," "lacks insight," and "financially unstable."  (Tr. 484).  Summarizing Mr. Williams' condition, prominent symptoms included "sad and depressed mood for at least 2 consistent weeks out of every month, feelings of hopelessness, worthlessness, impaired sleep, suicidal ideation, extreme anxiety "most of the time," racing thoughts, confused thinking, nightmares, increased arousal in the form of sweating and panic, intrusive thoughts of his traumatic experiences, feelings of victimization leading to rage and possible impulsive anger outbursts."  (Tr. 485).  PCP observed that Mr. Williams "meets the criteria for services through Targeted Case Management program given his long standing and severe problems with depression and anxiety and the detrimental impact of his mental health issues on his ability to meet his needs."  (Tr. 486).  PCP proposed to offer

12

medication management and coordination of services between mental health and medical providers as well as assist Claimant with housing and monitor his substance abuse tendencies. (Tr. 486). Participation in the Psychosocial Rehabilitation Program was also mentioned. (Tr. 486). Claimant's unmet needs were identified as psychiatric, mental health, housing, financial, medical, vocational, transportation, physical, and psychological. (Tr. 486). The PCP evaluation and records note the extent to which Mr. Williams' symptoms of depression and anxiety "impede his daily functioning." (Tr. 456).

On April 27, 2011, Dr. Hartnagel reported that Mr. Williams "continues to have significant problems with anxiety and panic." (Tr. 341). The progress note states that Mr. Williams could not tolerate Cymbalta. (Tr. 341). Claimant "is making slow, steady progress despite not being on medications" and "is currently benefitting from outpatient therapy." (Tr. 341). Mr. Williams' affective state remained "very anxious and tense" and his mood "depressed and anxious." (Tr. 341).

In May 2011, Mr. Williams began participating in outpatient services Carolinas HealthCare BHC. (Exh. 14F). Mr. Williams' outpatient therapist was Russell Hancock, Ph.D. (Tr. 349–439). Mr. Williams also participated in group therapy focused on overcoming anxiety with Jim McQuiston, LCSW, and Dawn VanHoy, LPC. (Tr. 333, 337). Dr. Hancock's notes detailing the individual monthly to bi-monthly counseling sessions with Claimant are highly probative of Claimant's mental wellbeing during the relevant time period as they track the successes and setbacks of Mr. Williams more closely than the group therapy records. Taken as a whole, Dr. Hancock' notes tend to show that Mr. Williams, in fact, made significant progress

learning to cope with his anxiety by participating in individual and group therapy.[13]  Of particular

relevance here, Mr. Williams discussed his application for disability insurance benefits with Dr.

Hancock in March 2012 and asked whether Dr. Hancock thought he'd be able to work.  (Tr.

357).  Dr. Hancock's records state: "This psychotherapist noted client may have the capacity to

work, but needed to explore areas of his mental health that left him feeling insecure and

threatened by others."  (Tr. 357).  Dr. Hancock did not supply any formal opinion on Mr.

Williams' mental RFC or specific functional limitations.

In August 2011, Dr. Manuel Castro, also with Carolinas HealthCare BHC, examined Mr.

Williams for routine medication evaluation and psychiatric assessment.  (Tr. 339−40).  Claimant

presented "with ongoing complaints of severe anxiety, possible paranoia, agitation, ongoing

problems with sleep disruption, restlessness and agitation."  (Tr. 339).  However, Dr. Hartnagel

noted the commendable effort made by Mr. Williams in seeking to treat his anxiety through

outpatient therapy.  (Tr. 339).  There was no change in affective state or mood.  (Tr. 339).

Attention and concentration slightly impaired.  (Tr. 339).  Mr. Williams' Axis I Diagnoses were:

Anxiety Disorder, NOS, Rule out posttraumatic stress disorder, and History of polysubstance

abuse. (Tr. 340).  Paxil was prescribed to help with anxiety.  (Tr. 339).

In October 2011, progress note states that Mr. Williams never filled the Paxil prescription

and that past trials of medications have been disastrous.  (Tr. 337).  Dr. Castro wrote of the

"remarkable progress" Mr. Williams had made in therapy as well as his desire not to take any

medication.  (Tr. 337).  Mr. Williams' affective state and mood were both "anxious."  (Tr. 337).

Since Claimant was not taking medication for his anxiety and/or depressive disorder, Dr. Castro

---

[13]  The undersigned does not discount the ALJ's recognition that Claimant made "substantial progress" in combatting his mental impairment by taking advantage of outpatient services at Carolinas HealthCare BHC.

did not schedule a follow-up visit but recommended that Mr. Williams continue in outpatient therapy and contact him to reconsider options for medications. (Tr. 337−38).

In November 2011, Williams was a "walk-in" for medication evaluation and psychiatric assessment with Dr. Castro following "decompensation" in his psychiatric wellbeing. (Tr. 335−36). According to Dr. Castro's notes:

> The patient states that recently he had been feeling paranoid, agitated and becoming more argumentative with others for no apparent reason. The patient had reported three separate physical altercations with strangers who he felt were talking about him. The patient clearly has been more anxious and possibly more paranoid. The patient states that he is more open to medications at this time.
> The patient is not suicidal, but stated that at times he does not have the desire to live. The patient does not meet any criteria for hospitalization.

(Tr. 335). Dr. Castro prescribed Seroquel, an antipsychotic medication.[14] (Tr. 335, 382). Mr. Williams' affective state was "very anxious and almost paranoid in his description of his recent behaviors and his mood was "anxious and sad." (Tr. 335). Mr. Williams' Axis I Diagnoses were: Anxiety Disorder, NOS, Rule out posttraumatic stress disorder, and History of polysubstance abuse. (Tr. 336). Mr. Williams' Axis III Diagnosis was Spinal Stenosis and Axis IV Diagnoses included: Social supports, finances, housing, vocational. (Tr. 336). Dr. Castro rated Mr. Williams' GAF a 50, which indicates <u>serious</u> <u>impairment</u> in social and occupational functioning. (Tr. 336). Dr. Hancock's treatment notes from November 2011 also speak to Mr. Williams' frustration with "violent urges" and suicidal thoughts. (Tr. 382).

In December 2011, Mr. Williams saw Dr. Castro again for routine medication evaluation and psychiatric assessment. (Tr. 333). Reportedly, taking Seroquel had improved Mr. Williams' symptoms of anxiety, irritability, and paranoia. (Tr. 333). Prior to Seroquel, Claimant

---

[14] Seroquel (or Quetiapine) is an atypical antipsychotic prescription drug approved for the treatment of schizophrenia, bipolar disorder, and along with an antidepressant to treat major depressive disorder.

reportedly was getting into fights. (Tr. 333). With respect to mental status, Dr. Castro noted that Mr. Williams' mood was "slowly improving." (Tr. 333). Dr. Castro rated Mr. Williams' GAF a 50 again. (Tr. 334). Claimant had resumed a pain medication regimen (taking tramadol) due to his spinal stenosis and chronic back pain. (Tr. 333).

In January 2012, Dr. Hancock's treatment notes reflect that Mr. Williams was encountering additional problems with his anxiety. (Tr. 376). Mr. Williams reportedly stayed home for the better part of his days (presumably in between counseling sessions) and only left home for his appointments with Carolinas HealthCare BHC. (Tr. 376). Mr. Williams tried to go to the mall during the holiday season with his niece but had to exit immediately after going in to regain composure. (Tr. 376).

In March 2012, Mr. Williams underwent evaluation again with Dr. Castro. (Tr. 331−332). Mr. Williams continued to experience reduction in anxiety and was sleeping better while on Seroquel. (Tr. 331). He remained active in outpatient therapy. (Tr. 331). Nonetheless, Mr. Williams had "fleeting suicidal thinking that he [stated] he would not act on." (Tr. 331). Specifically, Mr. Williams stated he had thoughts of jumping out of his second story apartment window or running into traffic. (Tr. 331). He also reported "experience[ing] his own consciousness" but denied hearing voices. (Tr. 331). While Claimant recognized the progress made in reducing anxiety, he reported being frustrated with his inability to attend family functions or go to the mall. Dr. Castro opined that Mr. Williams did not merit inpatient treatment. (Tr. 331). Mr. Williams' affective state was "significantly anxious, but some reductions noted" and his mood "anxious." (Tr. 331). GAF was 50. (Tr. 332). Seroquel dosage was increased to 100 mg at night and 25 mg one b.i.d. for anxiety and sleep. (Tr. 332).

In May 2012, Mr. Williams reportedly was having "more better days than bad days" yet still experiencing "episodes of depression and anxiety." (Tr. 329). Dr. Castro noted that Mr. Williams "is still highly anxious in social situations, but has made substantial progress." (Tr. 329). Mr. Williams was taking the bus independently and a substantial reduction in his paranoia was noted. (Tr. 329). Dr. Castro observed that Mr. Williams "does well with strong support through therapy and with family members." (Tr. 329). Claimant had resumed pain medication regimen due to his chronic back pain and stenosis and was taking gabapentin and oxycodone with some relief. (Tr. 329). Mr. Williams' mood was "improving" and "evolving insight" noted. (Tr. 329). Mr. Williams was not suicidal. (Tr. 329). Claimant's GAF remained at 50. (Tr. 330). Dr. Castro continued Mr. Williams on Seroquel as prescribed. (Tr. 330).

In June 2012, during his evidentiary hearing before the ALJ, Mr. Williams testified that he was limited physically by spinal stenosis (lower back) and "claudication with anxiety and depression."[15] (Tr. 36). Mr. Williams further testified that his depression occasionally kept him isolated for periods of time up to four consecutive days. (Tr. 36). In describing his anxiety, Mr. Williams testified that he suffers from panic attacks, shortness of breath, and claustrophobia. (Tr. 41). Claimant takes Seroquel for these symptoms and also sees a therapist for help with his "[a]bility to cop[e] with people" and to learn strategies for overcoming his anxiety. (Tr. 41−42). Mr. Williams testified that he has problems being around crowds and that it keeps him from

---

[15] "Spinal stenosis is a narrowing of the spinal cord which may be caused by arthritis or by a herniated disk. Spinal stenosis may cause neurologic symptoms, including pain, that are somewhat different from the pain associated with a herniated disk pressing directly upon a nerve root. The pain of spinal stenosis is felt in the thighs or calves on standing and walking. It is typically eased by being in a bent posture or sitting." *Social Security Disability Practice* § 7:2 (2015).

During the hearing, one of Mr. Williams' diagnoses was referred to as neuroclaudication or pseudoclaudication. (Tr. 40). "Claudication is pain in the muscles of the leg upon walking caused by poor blood circulation to the leg. Pseudoclaudication is pain in the muscles of a leg upon walking caused not by poor circulation but by spinal stenosis." *Social Security Disability Practice* § 7:2 (2015).

going out of his house "most of the time."  (Tr. 42).  Mr. Williams participates in group therapy and represented that he looks forward to group therapy; "for the most part that's where [he's] most comfortable."  (Tr. 42).  On a few occasions, when the group is large in number ("way too many people"), Mr. Williams has experienced anxiety and left group therapy.  (Tr. 42).  Mr. Williams' anxiety affects his ability to sleep.  (Tr. 42−43).  He also reports having nightmares and increased pain accompanying his anxiety.  (Tr. 43).

Mr. Williams does not drive and relies instead on public transportation to get to his doctor's appointments and therapy appointments.  (Tr. 43).  A neighbor takes Mr. Williams to the bus stop.  (Tr. 43).  Mr. Williams stated that he has to remove himself from the bus frequently due to overcrowding or because he is unable to find a suitable seat (where he can be "comfortable without being anxious").  (Tr. 43−44).  When in a depression, Mr. Williams does not take a bath every day, eat three meals a day, or clean up after himself.  (Tr. 44).

Mr. Williams was living with his niece at the time of the hearing.  (Tr. 44).  Reportedly, Claimant's niece regularly reminded Claimant to come out of his bedroom.  (Tr. 44).  Initially, Mr. Williams tried to help out around the house by doing some painting, but Claimant does not help with household chores anymore due to back pain.  (Tr. 45−46).  Claimant also testified that he has problems with concentration and that when he's at home, he switches from one activity or stance (sitting or standing) throughout the day.  (Tr. 47).

### 1.  August 2010 RFC Opinion of Dr. Albertson

With respect to Mr. Williams' <u>physical complaints</u>, the Disability Determination Explanation completed by W.W. Albertson, Ed.D., on August 26, 2010 as part of the initial evaluation found Claimant's allegations "partially credible."  (Exh. 1A) (Tr. 50−58, 52).  "Claimant's physical allegations are partially credible as he states that he has low back pain and

is unable to bend over.  Evidence shows he consistently walks with a steady gait and Xrays show[] a normal spine."[16]  (Tr. 52).  In conclusion, Dr. Albertson found that Mr. Williams' exertional RFC would render him capable of performing past relevant work as a rebar worker as it was actually performed in the construction industry.  (Tr. 57).

In his assessment of <u>mental RFC and non-exertional limitations</u>, Dr. Albertson identified Affective Disorder as Mr. Williams' primary diagnosis and deemed it to be a severe impairment.[17] (Tr. 53).  With respect to Claimant's non-exertional functional limitations, Dr. Albertson opined that Mr. Williams had the following significant limitations:

> <u>In understanding and memory</u> –
> **"Moderately limited" in the ability to understand and remember detailed instructions; "Claimant would have difficulty remembering detailed instructions due to depression**."
> <u>In sustained concentration and persistence</u> –
> **"Moderately limited" in the ability to carry out detailed instructions**;
> **"Moderately limited" in the ability to maintain attention and concentration for extended periods**;

---

[16]  Although claimant's original allegations of back pain were characterized as subjective and the initial lumbar spine x-ray was "normal," subsequent examination and testing produced objective medical evidence of his lumbar degenerative disc – an underlying medically determinable physical impairment the ALJ recognized as reasonably capable of causing the alleged chronic back pain.  (Tr. 25) (Exhs. 7F, 10F, 11F, 16F).  The ALJ ultimately determined that claimant's alleged pain was out of proportion to the radiologic review and that the conservative treatment (including lack of a good surgical option) plan militated towards a finding that claimant was not disabled.  (Tr. 26).

[17]  A secondary authority aimed at helping federal courts evaluate mental illness and impairments for purposes of social security disability determinations explains as follows:

> Affective disorders also include major depressive disorders. These disorders resemble the depressive phase of bipolar disorder, but the patient does not suffer the mood swings to the manic phase, as in bipolar disorder. However, like bipolar disorders, major depression is episodic. **As a general matter, while inconsistency with the record can justify devaluing the treating physician's assessment about a mental disorder, consistency does not require similarity in findings over time despite a claimant's evolving mental status and it must be evaluated in the context of "the record as a whole." Symptoms that "wax and wane" are therefore, not inconsistent with a diagnosis of recurrent, major depression**.

*Social Security Disability Law and Procedure in Federal Court*, § 5:25 (2015) (emphases added).

**"Moderately limited" in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; Limitations due to depression**;

In social interaction –
**"Moderately limited" in the ability to accept instructions and respond appropriately to criticism from supervisors; Limitations due to depression**;

In adaptation –
**"Moderately limited" in the ability to respond appropriately to changes in the work setting; Can adapt in a stable work environment**.

(Tr. 54−56) (emphases added). Under "Additional Explanation," Dr. Albertson opined:

> The claimant has a normal MSE and is capable of SRRTs while abstaining from drug and alcohol use (hx of drug abuse) and complying with treatment and medication. DAA is condition. Opinions are considered and incorporated in MRFC rating decisions where consistent with MER and ADLs.

> Allegations are partially credible.

(Tr. 56).

## 2. January 2011 RFC Opinion of Dr. Wax

The second state agency psychological consultant, Tovah M. Wax, Ph.D., also found that Mr. Williams could perform the full range of light work. (Exh. 3A) (Tr. 60−71). Dr. Wax, which Disability Determination Explanation was completed at the reconsideration level January 27, 2011, rated Mr. Williams' mental RFC in each category essentially the same as Dr. Albertson with a few exceptions.[18] Dr. Wax noted, "overall no substantively new / different mental impairment information and / or change in functioning indicated; therefore, confirming prior PRTF / MRFC for SRRTs."[19] (Tr. 64−65). Prior to formulating Claimant's RFC later in his

---

[18] In evaluating "B" criteria of the listings at step three, Dr. Wax found Mr. Williams had "Moderate Difficulties in Maintaining Concentration, Persistence, or Pace." (Tr. 64). Dr. Wax did not find moderate limitation when he formulated his RFC. Much of the language used on the forms by both doctors is identical – even their respective final "PRT and MRFC − Additional Explanation" narratives use exactly the same language. (Tr. 56, 64−65, 69).

[19] PRT stands for psychiatric review technique. MRFC stands for mental residual functional capacity. SRRTs is an abbreviation for simple, routine, repetitive tasks. DAA stands for drug addiction

sequential evaluation process, Dr. Wax opined that Mr. Williams was "[n]ot significantly limited in the ability to maintain attention and concentration for extended periods." (Tr. 68). Dr. Wax goes further than Dr. Albertson in stating that **"Non-exertional limitations do not significantly erode the occupational base . . . ."** (Tr. 70) (emphasis added). Dr. Wax relied on the Grids as a framework, namely Rule 202.17, and cited the following three occupations in which there are a significant number of jobs that exist in the national economy: Mail Clerk, Order Caller, and Cashier II.[20] (Tr. 70).

### B. ALJ's Discussion of Claimant's Residual Functional Capacity

Here, the ALJ began his RFC analysis by explaining that since Mr. Williams' testimony and subjective complaints were not credible, RFC findings must be based on more reliable evidence. (Tr. 27). The ALJ stated that he had "given the most weight to the treatment records." (Tr. 27) ("no treating, examining, or consulting physician has described Mr. Williams as "disabled" or imposed specific functional limitations consistent with an inability to perform any substantial gainful activity"). The ALJ stated: "I agree with the functional limitations imposed by the state agency consultants but, I have imposed additional limitations on lifting and carrying based on the additional medical evidence unavailable to them." (Tr. 27). According to the ALJ, "[t]he state agency medical consultants concluded that the claimant was able to meet the mental demands of work, and that he was able to meet the physical demands of "light" work that did not require more than occasional climbing, balancing, stooping or crouching." (Tr. 27 / Exh. 3A).

---

and /or alcoholism. MSE stands for mental status examination or evaluation. MER stands for medical evidence of record. ADLs stands for activities of daily living.

[20] Rule 202.17 of the Grids directs a finding of "not disabled" if claimant is a younger individual with limited education, is at least literate and able to communicate in English, and capable of performing unskilled work, with no transferable job skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.17. Rule 202.17 does not contemplate or take into consideration other nonexertional limitations.

The ALJ stated that the claimant's lumbar disc disease supported limitations on lifting and carrying and that the claimant's mental impairment limited him to performing "simple, routine tasks involved in unskilled work."[21]  (Tr. 27).   However, the ALJ did not include these functional limitations in his RFC finding of fact, which simply stated that Mr. Williams has the RFC to perform the full range of sedentary work.  (Tr. 24).

The threshold question is whether the ALJ's RFC stating that claimant's mental impairment limited him to performing "simple, routine [repetitive] tasks involved in unskilled work" is consistent with the teachings of *Mascio*.  *See Mascio*, 780 F.3d 632.  The Commissioner argues that Mr. Williams does not assert any additional specific functional limitations related to his mental impairment of major depressive disorder, that the Grids are properly relied upon in this instance, and that the ALJ's decision adequately explains his underlying RFC rationale. Because the ALJ did not perform a function-by-function analysis of Mr. Williams' RFC, and because the limitation of "simple, routine [repetitive] tasks involved in "unskilled work"" does not resolve the question of Mr. Williams' mental (nonexertional) RFC, remand is appropriate.

---

[21]  As noted by the Commissioner in his supplemental brief, this reference to "simple, routine tasks" by the ALJ appears to be a scrivener's error.  (Doc. 23, 4 n. 4).  The correct terminology, and that used by the state agency medical consultant, is "simple, routine, repetitive tasks" (or "SRRTs").  The Commissioner contends that this error is immaterial since "the ALJ accounted for a limitation to SRRTs by relying on the Agency's Medical-Vocational Guidelines."  Id.  The Commissioner also asserts that a limitation to SRRTs is more restrictive and more beneficial to a claimant than a limitation to "unskilled work," which was the focus of the Commissioner's original memorandum of law.  Id. (citing *Teeter v. Astrue*, 3:12CV190-GCM-DSC, 2012 WL 5409661, at *3 (W.D.N.C. October 19, 2012) (M&R) ("Defendant invites the Court to conclude that a limitation to unskilled work is synonymous with a limitation to simple, routine, repetitive tasks. There is no indication in the record that the VE or the ALJ reached such a conclusion."), *adopted*, 2012 WL 5405531, at *2 (W.D.N.C. November 6, 2012).

## C. The ALJ Did Not Perform A Function-By-Function Analysis of Claimant's RFC

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Scruggs v. Colvin*, 2015 WL 2250890, ** 3−4 (May 13, 2015 W.D.N.C.) (quoting SSR 96–8P). The RFC assessment must address both the exertional and nonexertional capacities of the individual. *Scruggs*, 2015 WL 2250890, ** 3−4. Nonexertional capacity considers work-related limitations and restrictions that do not depend on an individual's physical strength, such as "an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) ....it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes)." *Id*. Nonexertional capacity must be expressed in terms of work-related functions. *Id*. at *6. Of particular relevance here, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15.

In this case, the ALJ failed to discuss the essential mental demands of unskilled work, namely, Claimant's "ability (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. Instead, the ALJ stated simply that "the state agency medical consultants concluded that the claimant was able to meet the mental demands of work . . . ." (Tr. 27). As such, the ALJ did not conduct a function-by-function analysis of Mr. Williams' RFC. The impact, if any, of Claimant's ability to meet the essential

23

mental demands of unskilled work is not clear from this record.  *See* SSR 85-15 ("A substantial

loss of ability to meet any of these basic work-related activities would severely limit the potential

occupational base.")

> ### D.  The ALJ's RFC Failed To Account For Claimant's Moderate Difficulties In Concentration, Persistence, and Pace

Under Fourth Circuit law, an ALJ does not account for a claimant's limitations in

concentration, persistence, and pace by restricting the RFC to simple, routine, or repetitive tasks.

*Mascio*, 780 F.3d at 638; *see also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th

Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (per curiam); *Ramirez v.*

*Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996).

"As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task.

Only the latter would account for a claimant's limitation in concentration, persistence, or pace."

*Id*. at 638.  In *Mascio*, the ALJ stated that he found Mascio's claims that she suffered from a

limitation in concentration, persistence, and pace on account of pain "less credible" and did not

include the limitation in the RFC or the hypothetical question to the vocational expert.  The ALJ

did not explain whether he found it partially or completely incredible.  *Id*.  The Fourth Circuit

held that remand was therefore appropriate because the hypothetical was potentially incomplete.

The record in this matter likewise presents a case for remand.  The ALJ determined that

Mr. Williams did, in fact, have a moderate limitation in concentration, persistence, or pace, and

yet did not include the limitation in the RFC.  The ALJ merely limited Mr. Williams to simple,

routine, [or repetitive] tasks.  According to the Commissioner, the ALJ adequately accounted for

Plaintiff's mental limitations in the RFC by restricting him to "simple, routine [and repetitive]

tasks involved in "unskilled" work."[22] (Tr. 27).  This does account for some of Mr. Williams'

mental limitations under SSR 96-8p, such as the claimant's ability to understand, carry out, and

remember instructions.  Significantly, however, there is no discussion of how Mr. Williams may

be limited in other areas such as responding appropriately to supervision, co-workers, and work

situations, dealing with changes in a routine work setting, and experiencing or coping with

limited concentration.  SSR 96-8p, 1996 WL 374184 at *6.

Next, the Commissioner argues that the ALJ's RFC finding does not run afoul of *Mascio*

because it is supported by the state agency medical consultants, Dr. Albertson and Dr. Wax.  As

previously explained, the RFC opinions of the state agency physicians are partially inconsistent,

yet the ALJ grouped the two together and adopted both without distinguishing between the two

RFC opinions.  More importantly, however, the ALJ – as opposed to the state agency medical

consultants – is tasked with performing a function-by-function assessment of a claimant's RFC.

*See Scruggs*, 2015 WL 2250890, * 3 ("The ALJ is solely responsible for determining the RFC of

a claimant.") (citing 20 C.F.R. § 404.1546(c)).

With respect to Mr. Williams' depressive disorder, the only specific functional limitation

contemplated by the ALJ's RFC is the limitation to simple, routine, [repetitive] tasks, which is

insufficient under *Mascio*.  This is true even though the ALJ agreed with at least one of the state

psychologists (Dr. Albertson) that Mr. Williams had moderate limitations in these areas.  Under

*Mascio*, if the ALJ determines that the claimant's moderate difficulties in concentration,

persistence, and pace do not translate into a limitation in the claimant's RFC, the written decision

---

[22] On this issue, the Commissioner cites cases that pre-date *Mascio* and, therefore, are unpersuasive
to the extent they contradict current Fourth Circuit law.

must say so.  *See Mascio*, 780 F.3d at 638.[23]  Moreover, even if the ALJ adopted one or both of

Dr. Albertson's and Dr. Wax's assessments of the appropriate mental RFC, it does not mean that

such  a determination accounts for all of Mr. Williams' functional limitations, as the Fourth

Circuit has made clear.  *See* SSR 85-15 ("The decision[]maker must not assume that failure to

meet or equal a listed mental impairment equates with capacity to do at least unskilled work.

This decision requires careful consideration of the assessment of RFC.")  There is no careful

consideration of Mr. Williams' severe mental impairment and related functional limitations

within the ALJ's decision.  To the extent the ALJ deemed Dr. Wax's opinion on non-exertional

functional limitations controlling, the ALJ's written decision should make that plain and explain

the reasons for assigning greater weight to Dr. Wax's RFC opinion.  *Mascio*, 780 F.3d at 638.

Absent such an explanation, remand is necessary.[24]

Finally, according to Mr. Williams, the ALJ's RFC approach is inconsistent with his

recognition of his depressive disorder as a severe impairment since, by definition, a severe

impairment "significantly limits an individual's physical or mental abilities to do basic work

activities").  *See Youngman v. Astrue*, 2012 WL 874701, * 3 (February 21, 2012 E.D.N.C.)

(unpublished) ("To determine that a "severe" impairment does not limit an individual's ability to

---

[23] "[T]he ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert."  So as not to frustrate meaningful review, the ALJ is required to explicitly state that this is his determination and give reasons for why he reached this conclusion.  The ALJ here failed to do so.

[24] While *Mascio* does not create a *per se* rule, Fourth Circuit courts have been inclined to remand even where other mental limitations are accounted for in the RFC.  *See, e.g. Malpass v. Colvin,* No. 7:14-CV-164-BO, 2015 WL 3409193, at *2 (E.D.N.C. May 27, 2015) (remanding where the ALJ did not include an adequate explanation for leaving out claimant's moderate limitation); *Hemp v. Comm'r, Soc. Sec. Admin.*, No: SAG-14-2855, 2015 WL 4111483, at *3 (D. Md. July 7, 2015) (finding that a limitation to a stable environment did not account for concentration, persistence, and pace limitations and that remand was appropriate); *Bailey v. Colvin*, No. 5:14-CV-0248-DCN, 2015 WL 2449044, at *13 (D.S.C. May 21, 2015) (remanding where the ALJ did not provide an explanation).

do work is logically inconsistent."), *adopted by Youngman v. Astrue*, 2012 WL 870852 (March

14, 2012 E.D.N.C.) (remanding to Commissioner for further proceedings). In the Court's

experience, there is often a lack of understanding regarding the potential impact of a mental or

nonexertional impairment upon an individual's capacity to sustain full time employment,

particularly where combined with a severe physical or exertional impairment. Here, this is

evident in the use of multiple terms to describe Mr. Williams' primary (Axis I) diagnosis of

depressive disorder or bipolar disorder.[25]

## V.     The ALJ Improperly Relied On The Medical-Vocational Rules ("Grids")

The Claimant further contends that, in light of his severe mental impairment, the ALJ erred

in relying on the Grids without employing a vocational expert to support his step five

determination.

---

[25] The diagnoses of major depressive disorder and bipolar disorder are significantly different.

One of the most dramatic of the affective disorders is Bipolar I Disorder, formerly known as manic-depressive illness. "Bipolar disorder is a severe psychiatric illness marked by episodes of mania and depression, impairment of functioning—both cognitive and behavioral, and is frequently complicated by psychotic symptoms (e.g. delusions, hallucinations, and disorganized thinking." Bipolar I disorder, a disease that is, by definition, episodic. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a "good day" does not imply that the condition has been treated. "Given the episodic nature of bipolar disorder, short-lived improvements in functioning are consistent with the diagnosis and cannot, by themselves, constitute substantial evidence to override treating source opinions that [the claimant] was significantly impaired." A patient suffering from Bipolar I Disorder experiences both manic and depressive episodes. During the manic episodes, the patient has an "abnormally and persistently elevated, expansive, or irritable mood." During the depressive episodes, the patient has a markedly diminished interest in all or almost all activities, most of the day, nearly every day. The patient may feel worthless, excessively or inappropriately guilty, fatigue, or depressed most of the day." A poor memory is often a symptom of depression.

*See Social Security Disability Law & Procedure in Federal Court* § 5:25 (2015) (internal citations omitted). In light of the nature of the illness, when considering a claimant's compliance with recommended treatment, an adverse credibility inference is not always appropriate and should not be determinative in any event since failure to comply with treatment may represent a symptom of the mental illness. *Id.*

As a general rule, expert vocational testimony, and not just a reading of the Grids, is required by the Fourth Circuit when a claimant shows a severe nonexertional limitation.  *See Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983) (requiring the [Commissioner] of SS to provide vocational testimony of available jobs in the event claimant suffers from nonexertional limitations); *Smith v. Schweiker*, 719 F.2d 723 (4th Cir. 1984) (precluding reliance on the Grids to determine a claimant's disability when a nonexertional condition affects an individual's RFC to perform work which he/she would otherwise be exertionally capable of performing). *Smith* explains as follows:

> "The proper inquiry, under *Grant*, is whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. If the condition has that effect, it is properly viewed as a nonexertional impairment, thereby precluding reliance on the [G]rids to determine claimant's disability."

*Smith*, 719 F.2d at 725 (interpreting *Grant*, 699 F.2d 189) (internal quotations omitted). Therefore, reliance on the Grids is precluded *only if* the nonexertional condition in question is credibly found to affect the individual's RFC to perform work of which he is otherwise exertionally capable.  *Id*.; *see also Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989) (explaining how each Grid considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that claimant is able to perform; remanding to Commissioner where evidence showed claimant's pain to be sufficiently nonexertional in nature so as to prelude use of the Grids as dispositive of claim).

Here, the ALJ's RFC determination frustrates judicial review of this procedural issue as well.  As an initial matter, the Commissioner does not dispute that major depressive disorder is a mental impairment and classic example of a nonexertional impairment.  *See* SSR 93-10 (nonexertional impairment is one that affects the mind) and 20 C.F.R. § 416.969a(c)(i)−(iii)

(identifying specific nonexertional limitations). The Commissioner suggests that the Grids adequately account for any nonexertional impairment of claimant because the Grids are limited to unskilled work. *See* Grid § 200.00(b) (Grid exclusively limited to "unskilled jobs"). However, for the reasons already explained in connection with the ALJ's findings as to Mr. Williams' mental RFC, it does not suffice to simply restrict Claimant to unskilled work pursuant to *Mascio*. Thus, the ALJ's exclusive reliance on the Grids also falls short. In addition, the ALJ does not address *the combined effect* of claimant's severe exertional and nonexertional impairments at step five. Given Mr. Williams' exertional and nonexertional functional limitations and the record as it current exists, it is incumbent upon the Commissioner to establish why – through expert vocational testimony as opposed to exclusive reliance on the Grids – specific jobs exist in the national economy that Mr. Williams can perform despite all of his impairments. *See e.g., White v. Colvin*, 2014 WL 1320235 (March 31, 2014) (remanding for vocational expert testimony in light of claimant's combined exertional and nonexertional impairments). On this record, the Court finds that the ALJ's step five determination that Plaintiff could perform other work is not supported by substantial evidence.

## VI.    The ALJ's Step Three Analysis Hinders Substantial Evidence Review

For purposes of providing guidance to the Commissioner upon remand, the undersigned briefly addresses Mr. Williams' claim that the ALJ erred at step three as well. Plaintiff Williams contends that the ALJ's step three analysis is contrary to law in that the ALJ's decision does not adequately explain why Listing § 1.04A is not satisfied in this case. *See Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013) (holding that remand was proper remedy where ALJ "provided no basis for his conclusion" except to refer to state agency consultant's conclusions). In *Radford*, the Fourth Circuit explained the importance of the ALJ articulating his rationale:

> "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. If the reviewing court has no way of evaluating the basis for the ALJ's decision, then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."

*Radford*, 734 F.3d at 295 (internal citations and quotation marks omitted). Absent an adequate explanation of the ALJ's reasoning, the Court cannot undertake a "meaningful review." *Id.*, 296. Because the ALJ in *Radford* simply summarily pointed to the state medical examiners' conclusions (as opposed to applying the requirements of the listing to the medical record), the Fourth Circuit found that the ALJ decision was "devoid of reasoning." *Radford*, 734 F.3d at 292, 294. In other words, notwithstanding that the ALJ's "exclusive citation to [certain] opinions indicates the (apparently very high) evidentiary weight he placed on them, it does not indicate *why* the opinions merit that weight." *Radford*, 734 F.3d at 295 (emphasis in original). The panel made clear that referring to, or relying on, a state medical opinion in support of a conclusion as to disability does not constitute "substantial evidence." *Id.*

With respect to Plaintiff's *exertional RFC*, the ALJ did nothing more than recite summarily that, "The medical evidence does not establish the presence of medical findings that would meet or equal any listed impairment." (Tr. 24). While there is discussion of record evidence related to Mr. Williams' lower back pain within the ALJ's decision, there is no explanation of why the listings are not applicable. The Commissioner, in its summary judgment brief, makes a persuasive argument as to why the particular listing identified by Mr. Williams is not met or equaled. (Doc. 18, 7–10). The Commissioner further contends that any error at step three is harmless due to lack of prejudice. In other words, the Commissioner contends Claimant can't demonstrate prejudice given that he fails to present objective medical evidence to sustain

his burden of establishing all of the criteria for Listing § 1.04A. That question, however, is supposed to be addressed by the ALJ in the first instance – not post-hoc by the Commissioner and not by the Court. The ALJ's decision leaves the Court to guess which, if any, listings were considered and subsequently ruled out.[26]

## VII.    Order

**IT IS, THEREFORE, ORDERED** that the Commissioner's Motion for Summary Judgment is **DENIED** and the Plaintiff's Motion for Summary Judgment is **GRANTED**. Accordingly, this matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with the instant Memorandum and Order.

Signed: December 16, 2015

Richard L. Voorhees
United States District Judge

---

[26] The Commissioner concedes that the ALJ never even mentioned Listing § 1.04A or any listing for that matter. (Doc. 18, 7).